**The ESTATE of Janice E. PITRE, Plaintiff,**

v.

**WESTERN ELECTRIC CO., INC., Defendant.**

**Civ. A. No. 76–2218–EEO.**

United States District Court, D. Kansas.

Jan. 3, 1995.

Michael E. Callen, Kansas City, KS, Steven L. Hobson, Ronald J. Stites, Stites, McIntosh, Knepper & Hopkins, Kansas City, MO, for plaintiff Estate of Janice D. Pitre; individually and on behalf of all fellow employees and past employees of the defendant who are similarly situated.

Lawrence L. Ferree, III, Ferree & Bunn, Chtd., Overland Park, KS, Stanley E. Craven, Jack L. Whitacre, Spencer, Fane, Britt & Browne, Kansas City, MO, Georgann H. Eglinski, Spencer, Fane, Britt & Browne, Overland Park, KS, for defendant Western Elec. Co., Inc.

## MEMORANDUM AND ORDER

EARL E. O'CONNOR, District Judge.

This matter is before the court on Defendant's Motion to Terminate its Front Pay Obligation (Doc. # 231). In our July 10, 1989, order, we determined that defendant had engaged in gender-based discrimination against the class in violation of Title VII. Specifically, we found that the class had been discriminated against with respect to promotions within the salary-graded universe (designated as "M-level" positions) and promotions to the lowest management position ("section chief"). The court ordered that "front pay should be awarded until women comprise fifty percent of each M-level and the section chief level." *Estate of Pitre v. Western Elec. Co., Inc.*, 719 F.Supp. 966, 974 (D.Kan.1989).

Defendant contends that, as of March 31, 1994, women comprised fifty percent of each M-level and the section chief level as a result of personnel changes and promotions.[1] In support of this contention, defendant has submitted the affidavit of J.L. Kammerer, Operations Manager of the Custom, Manufacturing & Assembly Unit of AT & T Network Systems, Inc.[2] An exhibit attached to the affidavit documents the employees employed as of March 31, 1994, at each of the M-levels and section chief level, and reflects that women now occupy at least fifty percent of each salary graded job and SG–4 and SG–3 positions.

Plaintiff has responded, and opposes defendant's motion. Although plaintiff concedes that as of March 31, 1994, women comprised fifty percent of each R-level, SG–3 level and SG–4 level, plaintiff maintains that defendant has failed to fully comply with the court's order. Specifically, plaintiff asserts that defendant has failed to take into account the engineering group, which is comprised only of men. In essence, plaintiff claims that former M–50s were reclassified as Engineering Associates ("EAs"), but continued to perform their M–50 duties; therefore, these men must be counted in assessing whether defendant has met the precondition to termination of its front pay obligation.

Plaintiff argues that "[i]n creating and staffing the engineering group, the defendant merely gave new titles to employees who were performing various electrical and non-electrical engineering functions in the production and repair aspects of the business. New employees who were hired or transferred into the engineering group performed the same functions and duties which had been performed by Methods employees prior to 1983, or by M-level employees specializing in telecommunications work." In support, plaintiff relies upon the affidavit of Larry Rupp, an M–50 Methods Analyst who was transferred to the position of EA and is now retired. Rupp states that, as an EA, he continued to perform the same functions and duties that he had previously performed as an M–50 Methods Analyst.

The court held a hearing on October 5, 1994. After reviewing all the evidence and the arguments of counsel, the court makes the following findings of fact and conclusions of law.

### Findings of Fact

1. Jacob L. Kammerer is the operations manager at the Custom Assembly Center, and the highest ranking managerial person at the facility. Kammerer was first employed by Western Electric as an Engineering Associate in New Jersey in 1965, and was transferred to the Western Electric Service Center in 1983. In 1983, the Service Center employed one plant engineer, Don Haupt, and one EA, Rex Stevens.

---

1. At the time of the prior judgment and trial in this case, the salary graded jobs at issue were categorized in five levels, M–10 through M–50. These levels have now been changed to R–10 through R–50, with the R–10 grade not utilized. The section chief position is now designated SG–4. The position formerly designated Profession Administrative Employee is now designated SG–3.

2. The Custom, Manufacturing & Assembly Unit, a part of AT & T Corporation's Sales and Marketing Division, is the successor facility to the Western Electric Service Center. Hereinafter, the facility will be referred to as the "Custom Assembly Center" or the "Service Center."

2. On January 1, 1984, the court order divesting the seven regional Bell Telephone companies from AT & T was finalized and entered.

3. According to Kammerer, new EA positions were established in 1983 because the "traditional work" of telephone repair was being phased out as a result of divestiture. Kammerer testified:

> Prior to 1983, approximately, I would say, sixty to seventy percent of the shop's volume at our facility was repair of telephone sets. And that particular business was predicted to erode at a rate of approximately ten percent per year. And we saw for us to survive at our location we had to basically venture off into some other competitive ventures and other products.

4. When EAs were transferred from other facilities, the Service Center acquired products transferred from the EAs' previous facilities. When an EA was transferred from North Carolina, analogue radio equipment that had previously been manufactured at the North Carolina plant was transferred to the Kansas City facility. Another EA was transferred from Memphis at the time the Service Center received a product transfer of teletype circuit boards from an Illinois plant.

5. Three other EAs were hired to complete technical work acquired through competitive bidding. This work involved electronic assemblies, including the D–4 cabinets and the DDM–1000 system, and surface mount type manufacturing. The new products manufactured and repaired at the facility were more sophisticated and thus required greater technical skills on the part of the facility work force.

6. As a result of divestiture, the extensive engineering and technical support the Service Center had received from the regional engineering staff in St. Louis, Ballwin, and Chesterfield was being phased out. Prior to divestiture, there were approximately 100 EAs from the Chesterfield portion of the regional staff providing technical support to the Service Center, whereas today the Chesterfield staff consists of four to six EAs.

7. Before divestiture, the regional engineering staff provided all of the engineering and documentation procedures, and instructed the M–50s on the implementation. After divestiture, the Service Center expanded into custom assembly work, and the engineering, documentation, and development procedures became the responsibility of the Service Center. Consequently, Kammerer saw a need to develop a staff that would be capable of performing such work.

8. In May 1983, Kammerer and Manager W.A. Courtade requested and received authorization to establish an EA position for "special assembly electronic/microprocessor." The Southwestern Region Technical–Professional Classification Committee authorized the reclassification of two employees, Larry Rupp and Jim Jones, from the positions of M–50 Methods Analysts to EAs.

9. The newly created EA position involved responsibilities and duties that the EA position held by Rex Stevens did not encompass, and involved work that had not been done before. According to Kammerer, the role of Rex Stevens was to assist plant engineering, whereas the function of the new EA position "was more product oriented towards the things we were going to deliver to customers."

10. The new EA position also differed from the M–50 Methods Analyst position. Those responsibilities of the EAs that were not responsibilities of the M–50 Methods Analysts included: supporting the sales team in putting together bids and quotes, and accompanying the sales team on trips to visit with customers; preparing shop drawings and instructions for the skilled hourly work force; and interpreting design requirements. Additionally, the EA position was considered part of management, and was not a salary graded or an hourly position. The pay ranges and levels for the EAs differed and were higher than for the M–50s.

Kammerer testified that, as an EA, Rupp worked on products that required knowledge more sophisticated and technical than that required for M–50 work, and that Rupp was given more responsibility than he had had as a Methods Analyst.

11. Although, as an EA, Rupp continued to perform some of the same duties that he

had performed as an M–50 Methods Analyst, the work that he had performed as a Methods Analyst was distinct and more technical than the work performed by the other Methods Analysts. Even Rupp acknowledged that his M–50 job was "different," "more demanding," and more technical than the jobs of other M–50s. Rupp and Jim Jones, as M–50s, did some writing, including drafting instructions, that was not done by other M–50s. Only two M–50s, Jones and Rupp, worked on the more sophisticated electronic equipment.

12. In contrast, the other M–50s employed at the Service Center from 1973–1980 and through the divestiture period primarily worked for Southwestern Bell repairing telephone and teletype, and distributing and warehousing items. These M–50s received very detailed repair specifications and instructions from the regional engineering staff. The function of these M–50s was to interpret the instructions for the hourly employees. As this work was phased out and their workload declined, these M–50 Methods Analysts opted for enhanced early retirement or other special packages. These M–50s did not have the qualifications to meet the criteria for EA positions.

13. A job notice advising employees of the opening of two EA positions was posted at the Service Center in July 1984. Under the heading "QUALIFICATIONS REQUIRED," the notice stated:

Two years Electronic School or equivalent in experience. A complete knowledge of discreet component circuitry plus modern "State of the Art" integrated circuitry including Microprocessors. Have Analog, Digital, and Microwave theoretical knowledge. Posses [sic] sufficient skill and knowledge to write Assembly and Test Procedures on various nontraditional type electronic project.

Analysis of repair and production requirements associated ... with repair of Complex Circuits. Analysis of defective Complex Electrical Circuits which are trouble found by computerized test equipment to locate defects. Analyse [sic] customer requirements for repair, assembly, or manu-

facture of a wide variety of test equipment to locate defects.

Determine and prepare details to implement into production including material requirements, production intervals, costs, production layout, testing procedures, and product documentation. Develope [sic] software tests for special assembly type projects. Evaluate and develope [sic] calibration and test procedures on new or existing projects. Develope [sic] Cost Reduction in maintenance and repair of advanced electronic equipment.

14. As of June 20, 1985, the date of the court's original order in this case, there were six EAs at the Service Center. They were Stevens, Jones, Rupp, and three individuals recruited and hired out of college. All three newly hired EAs possessed bachelor's degrees in electronic engineering.

15. As of July 10, 1989, the date of the court's order imposing conditions for the termination of defendant's front pay obligation, the defendant had hired four additional EAs at the Service Center. Two of the EAs hired were transfers from other facilities where they had worked as EAs; one possessed a bachelor's degree in electrical engineering and had previously worked for AT & T Communications. The other individual was promoted from an hourly position to EA after receiving considerable electronic training.

16. Only one EA has been hired since the date of the court's July 10, 1989, order. That individual was serving as an EA at the North Carolina facility and was transferred to Kansas City when the North Carolina facility closed.

17. Of all the individuals who served as EAs, only two came from the M–50 group and both had the requisite technical skills required for the job. All of the other EAs were either newly hired EAs with bachelor's degrees in engineering, or transferred in as EAs from other facilities.

*Conclusions of Law*

The court finds that the defendant has met the obligations of our July 10, 1989, order requiring "front pay ... be awarded until women comprise fifty percent of each M-level

and the section chief level." 719 F.Supp. 966, 974. Plaintiff does not dispute that defendant has met this requirement. Plaintiff has presented no evidence to suggest that the engineering group was created as a subterfuge, with the intent to avoid compliance with the court's front pay termination requirement of fifty percent women participation "... at each M-level and the section chief level." *Id.* The engineering group was established in 1983, well prior to any fifty percent requirement imposed by our July 10, 1989, order. The only evidence presented reflects that the engineering group was created for legitimate business reasons, as a result of reorganization following divestiture.

Nor has plaintiff made any showing that the defendant engaged in discrimination against the class in hiring EAs for the engineering group. No class member has come forward claiming that she was qualified for, applied for, and was denied the EA position because of her sex. For these reasons, the court finds that the engineering group should not be considered in determining whether the defendant has met the court's precondition to termination of front pay liability.

IT IS THEREFORE ORDERED that Defendant's Motion to Terminate its Front Pay Obligation (Doc. # 231) is granted.

IT IS FURTHER ORDERED that the final front pay and monetary judgment in this case be entered in the amount of $20,-860.93, which represents two months of the projected front pay for 1994, from January 31, 1994, to March 31, 1994.